Julius R. NASSO, etc., Plaintiff,

v.

Steven SEAGAL et ano., Defendants.

No. CV–03–0443(CPS).

United States District Court, E.D. New York.

April 11, 2003.

Robert Jay Hantman, Hantman & Associates, Daniel C. Marotta, Dowd & Marotta, New York City, for Plaintiff.

Sung–Hee Suh, Schulte Roth & Zabel LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

Plaintiff Julius R. Nasso, individually and derivatively as a shareholder of Seagal–Nasso Productions, Inc. ("Productions"), brings this action against Steven Seagal and Steamroller Productions, Inc. ("Steamroller"), alleging breach of contract, breach of fiduciary duty, seizure of corporate opportunities, misrepresentation, conversion, and unjust enrichment. Defendants move to dissolve orders entered by the state court from which this action was removed and to dismiss the complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure for lack of personal jurisdiction and failure to state a claim, respectively. Plaintiffs cross-move for a remand of this action to the state court. For the reasons set forth below, the motions to dismiss are denied in part and granted in part and the cross-motion for remand is denied.

1. Except as otherwise noted, the facts contained in this section are drawn from plaintiff's amended complaint.

2. The complaint alleges that Seagal resided in Staten Island and held a gun permit reflecting this residence "at all relevant times" and that Staten Island was "the situs of a substantial part of the events or omissions giving rise to the claims." (Am.Compl.¶ 20, 22.)

## BACKGROUND

The following facts are taken from the papers submitted by the parties in connection with the present motions and, except as otherwise noted, are undisputed.

Underlying Dispute [1]

Steamroller, a California corporation with its principal place of business in California, is a "loan out" company, which employs Seagal, its sole shareholder, and provides his services as an actor. (Am. Compl.¶ 21.)

In early 1987, Nasso, a producer, met Seagal through a mutual acquaintance. Both of them were residents of Staten Island at the time.[2] On July 12, 1990, after Nasso and Seagal had worked together on several films, they organized Productions, a New York corporation with its principal place of business in Brooklyn, for the purpose of developing, producing, owning, and distributing motion pictures. Each of them owns half of the shares and serves as an officer of the corporation.

The amended complaint states that, sometime in 1997, Seagal–Nasso Distribution LLC (the "LLC") was organized for the purpose of distributing Productions' films and collecting foreign licensing fee advances, and Seagal–Nasso Films Inc. ("Films") was incorporated in California for the purpose of funding the activities of the LLC.[3] Both entities maintained their principal places of business in Los Angeles.

3. According to the documents contained in the state court record, Films was incorporated in California on March 9, 1998, and the LLC was created in Nevada on September 1, 1998, but is now dissolved. Films was the LLC's sole member. The papers submitted by Nasso in connection with the present motions state that Films was created to fund the activities of Productions.

In November 1997, Nasso and Seagal "agreed that [Productions] would develop, produce and market television and film projects." (Am.Compl.¶ 32.) They agreed that Nasso would develop, produce, and distribute films, that Seagal would star in them, and that Productions would own them. They also agreed that Nasso would be paid a production fee of $250,000 for each film and that Seagal would be paid the market value of his services.

According to the amended complaint, Seagal promised to "star" in four "feature films"—"Blood on the Moon," "Genghis Khan," "Smash and Grab," and "Prince of Central Park"—which were to be released as part of a package deal.[4] (Am. Compl.¶¶ 1–3, 41, 72–75, 87, 89, 91, 93.) As a result of these promises, Nasso spent at least three years and approximately $2.4 million acquiring literary rights, hiring employees, obtaining options for talent, paying for scripts, and attending film festivals to pre-sell foreign distribution rights for these films. In May 1998 and May 1999, he placed ten advertisements in different trade journals, which confirmed Seagal's participation in the four films. The LLC, "through Phillip Goldfine, as the agent, representative or employee of Seagal, or his related companies, entered into at least [thirty-one] foreign license agreements with the consent, knowledge and approval of Seagal, all of which stated that he (Seagal), was to be the star of the particular movie." (Am.Compl.¶ 63.) Pro-

ductions, Films, and the LLC (collectively, the "Nasso–Seagal Entities") incurred costs of at least $1.45 million in connection with the four films.[5]

On or about October 15, 1999, Nasso loaned $500,000 to Seagal to help Seagal satisfy his tax obligations. The loan was payable on demand. Nasso later demanded payment, but Seagal failed to make it. Seagal also entered or caused others to enter false entries in the accounting records of the Nasso–Seagal Entities concerning the respective contributions of Nasso and Seagal.

Seagal failed to appear in the four films. As a result, the Nasso–Seagal Entities lost between $21 million and $39 million in anticipated profits. Instead of appearing in these films, "Seagal, while working under the Seagal–Nasso Productions banner, and with the help of Nasso, who personally approached and had ... meeting[s] with Avi Lerner of Nu–Image Productions, Inc." and Joel Silver of Warner Brothers, appeared in "Ticker" and "Exit Wounds." (Am.Compl.¶ 108.) Seagal never shared with Nasso or the Nasso–Seagal Entities any of the $12.5 million in compensation that he received for his work on these two films.

Seagal states in an affidavit that on July 31, 2000, he sold his residence and another property in Staten Island to Nasso, that he has never resided in New York or owned property there since that time, and that he now resides in California.[6] In or around

---

**4.** Nasso alleges in an affidavit that, in 1997 and 1998, Seagal and Steamroller agreed at Seagal's New York residence that Seagal would star in "Blood on the Moon," "Genghis Khan," and "Smash and Grab." He also alleges that the production contract for "Price of Central Park" dated July 1, 1998, which states that Seagal will appear in the film, was prepared and finalized in New York with Seagal's knowledge and consent.

**5.** Nasso alleges in an affidavit that he and Seagal attended meetings in New York in December 1999 to discuss the distribution of "Blood on the Moon" with the chief executive officer of Paramount/Viacom and the distribution of all four films with the co-chief executive officer of Miramax–New Dimensions.

**6.** During oral arguments, Nasso stated that Seagal is still liable under the mortgage agreement covering the property. He states in an affidavit that Seagal maintains a gun

October 2000, Seagal closed the Los Angeles offices of Films and the LLC without the consent of Nasso or Productions. In the process, "Seagal, his agent, employees or representatives" removed or destroyed Nasso's personal items and corporate records of the Nasso–Seagal Entities. (Am. Compl.¶ 18.) In spite of repeated demands by Nasso and the Nasso–Seagal Entities, Seagal has not returned these records or items.

### Procedural History

On March 20, 2002, Nasso commenced the present action in the New York Supreme Court for Richmond County on his own behalf and on behalf of the Nasso–Seagal Entities. In his amended complaint, Nasso alleges on behalf of the Nasso–Seagal Entities that Seagal[7] (1) breached his contractual obligations to the Nasso–Seagal Entities by failing to star in the four films, (2) breached the fiduciary duty of good faith and fair dealing by failing to star in the four films, (3) seized corporate opportunities by appearing in "Ticker" and "Exit Wounds," and (4) converted corporate documents. Nasso alleges on his own behalf that Seagal (1) converted Nasso's personal items, (2) misrepresented the respective contributions of Nasso and Seagal by entering false entries in the accounting records of the Nasso–Seagal Entities, (3) was unjustly enriched when he accepted Nasso's services in connection with the four films without giving Nasso the expected compensation, (4) breached the fiduciary duty of good faith and fair dealing that he owed to Nasso as a business partner and equal shareholder by failing to star in the four films and by refusing to share the compensation he received in exchange for his work on "Ticker" and "Exit Wounds," (5) breached the partnership agreement he entered with Nasso, in which the two promised to work together to develop, produce, market, and distribute television and film projects and to collect licensing fee advances, and (6) breached the loan agreement he entered with Nasso, in which he promised to repay the sum of $500,000 on demand.[8]

In an order dated September 26, 2002 (the "September Order"), the Supreme Court denied defendants' motion to dismiss for lack of personal jurisdiction and for failure to state a cause of action.[9] De-

permit in New York and uses his old address and Productions' address on the related licenses. He also states that Seagal continues to visit New York to promote his career and for personal matters, that he generates income from New York when his films are viewed here and the products sold on his website are purchased here, and that he is represented by a law firm with offices in New York.

7. The amended complaint states that it "treat[s]" Seagal and Steamroller "as one entity." (Am.Compl.¶ 21.) .

8. In amending his complaint, Nasso added a demand for attorneys fees and expenses with respect to each of the claims that he asserts on behalf of the Nasso–Seagal Entities, clarified that he asserts the misrepresentation on his behalf alone, and added four of the claims that he now asserts on his own behalf—conversion of personal property, breach of fiduciary duty, breach of the the partnership agreement, and breach of the loan agreement.

9. The September Order stated that, in deciding motions to dismiss for failure to state a cause of action, New York courts determine " 'whether the proponent of the pleading has a cause of action, not whether he has stated one.' " (Sept. Order at 12) (citing *Leon v. Martinez*, 84 N.Y.2d 83, 87–88, 614 N.Y.S.2d 972, 638 N.E.2d 511). In making this determination, it stated, "a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint." (*Id.*) In denying the motion, the Supreme Court made it clear that it was relying on documentary evidence apart from the complaint.

fendants sought leave to reargue part of their dismissal motion and appealed the September Order to the Appellate Division of the Supreme Court.[10] In an order dated December 23, 2002 (the "December Order"), the Supreme Court denied the dismissal motion in its entirety, except that it dismissed the claims asserted on behalf of Films and the LLC because both were foreign corporations not authorized to conduct business in New York.[11] Defendants received the December Order on December 30, 2002. Nasso never appealed the December Order. On January 27, 2003, defendants filed a notice of removal with this Court.

Defendants move to dissolve the order dated September 26, 2002, and to dismiss all of the claims asserted in the amended complaint for lack of personal jurisdiction and for failure to state a claim. Nasso argues in response that reconsideration of September Order by this Court is precluded by the Rooker–Feldman doctrine and 28 U.S.C. § 1738, is prohibited under state procedural rules, would preempt adjudication of the appeal by the appellate division, would reopen issues of state law already decided by a state court, would encourage forum-shopping, would frustrate the goal of efficiency that underlies the Federal Rules of Civil Procedure, and is unlikely to result in dismissal of the entire complaint.

Even if reconsideration is proper, he argues, this Court should deny the motion because it has general jurisdiction over the defendants, as well as specific jurisdiction over them with respect to each of the claims, and because the amended complaint states valid claims upon which relief can be granted.

Nasso cross-moves to remand the action to state court on the grounds that defendants' filing of the notice of removal was untimely and that the dismissal of Films [12] in the December Order was improper. Defendants argue in response that the notice of removal was filed in a timely manner and that the dismissal was proper.

## DISCUSSION

This Court has jurisdiction over the subject matter of this action because complete diversity exists and because the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

### *Motion to Remand*

■ Nasso moves to remand this action, arguing that its removal was untimely and that this Court lacks subject matter jurisdiction because the Supreme Court improperly dismissed the claims asserted on behalf of Films, which is a citizen of the same state as defendants.[13]

---

10. That appeal was neither decided nor withdrawn.

11. Defendants allege, and Nasso does not dispute, that Films took no steps to obtain a license to conduct business in New York before it was dismissed. Nasso alleges, however, that Films now has an application pending.

12. Nasso states in his moving papers that the LLC was improperly dismissed but clarifies in his reply papers that Films, not the LLC, was improperly dismissed.

13. Nasso does not argue that the removal of this action was improper because it could not

have been brought originally in a federal court. Where removal is predicated on diversity jurisdiction, a case is generally not removable unless the parties were diverse not only at the time of removal but also at the time the action was commenced. *See, e.g., United Food & Commercial Workers Union, Local 919 v. CenterMark Props. Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994); *Vasura,* 84 F.Supp.2d at 538. "[W]hen a party whose presence would defeat diversity is [voluntarily] dropped from the state court action," however, "the case becomes removable even though diversity of citizenship did not exist when the state court action was commenced." 14B Wright, Miller & Cooper, Fed-

■ 28 U.S.C. § 1446(b) provides in pertinent part:

> The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of the initial pleading ... [or, if] the case stated by the initial pleading is not removable, ... of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable
> . . . .

It is "well established" that the thirty-day filing period, "while not jurisdictional, is mandatory." *Nicola Products Corp. v. Showart Kitchens, Inc.*, 682 F.Supp. 171, (E.D.N.Y.1988). Where a motion to remand has been filed, the removing party bears the burden of persuasion, and courts resolve any doubts in favor of the movant. *See id.; see also Somlyo v. J. Lu–Rob Ents., Inc.*, 932 F.2d 1043, 1045–46 (2d Cir.1991).

■ Nasso contends that the thirty-day filing period commenced once, or soon after, the original complaint was served because defendants "clearly must have ... known" that the nondiverse plaintiffs, Films and the LLC,[14] were foreign corporations that were not authorized to conduct business in New York and thus could not maintain their claims in a New York court. (Pl.'s Mem. at 16.) He states that there exists "[s]ubstantial authority" for the proposition that a defendant must remove upon learning that a case might be removable but fails to present any such authority.[15] Because the initial and amended complaints alleged that Films and Steamroller were citizens of the same state, "the case stated by the initial [and amended] pleadings was not removable" for the purposes of § 1446(b) even if defendants knew that Films and LLC were not licensed to conduct business in New York. *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 206 (2d Cir.2001) (holding that § 1446(b) "does not require a

eral Practice and Procedure: Jurisdiction § 3723, at 574–75; *see also Quinn v. Aetna Life & Cas. Co.*, 616 F.2d 38, 40 n. 2 (2d Cir.1980); *Arseneault v. Congoleum Corp.*, No. 01 Civ. 10657, 2002 WL 472256, at *2 (S.D.N.Y. Mar. 25, 2002). Where the state court dismissed the claims asserted by a nondiverse plaintiff and the plaintiff seeking remand failed to appeal, the dismissal is deemed by the courts of this Circuit to be voluntary. *See Quinn*, 616 F.2d at 40 n. 2; *Arseneault*, 2002 WL 472256, at *3.

**14.** For the purposes of establishing diversity of citizenship, a limited liability company is deemed to have the citizenship of its members. *Handelsman v. Bedford Village Assocs. Ltd. Pshp.*, 213 F.3d 48, 51–52 (2d Cir.2000); *Strother v. Harte*, 171 F.Supp.2d 203, 205 (S.D.N.Y.2001). Because Films, the only member of the LLC, was incorporated and maintained its principal place of business in California, both entities were citizens of California. See 28 U.S.C. § 1332(c) ("[A] corporation shall be deemed a citizen of any State by which it has been incorporated and of the

State where it has its principal place of business."). Because Seagal and Steamroller are also citizens of California, diversity was not complete, and this Court lacked subject matter jurisdiction when Films and the LLC were parties. *See, e.g., Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) ("A case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, *i.e.*, only if there is no plaintiff and no defendant who are citizens of the same State.") (internal quotation marks omitted).

**15.** None of the cases cited by Nasso stand for the proposition he puts forth. In each case, the parties were completely diverse when the action was first commenced. *See Somlyo v. J. Lu–Rob Enterprises, Inc.*, 932 F.2d 1043, 1044–46 (2d Cir.1991); *Nicola Products Corp.*, 682 F.Supp. at 172; *Staples v. Joseph Morton Co.*, 444 F.Supp. 1312, 1313–14 (E.D.N.Y. 1978); *Fisher v. Exico Co.*, 13 F.R.D. 195, 196 (E.D.N.Y.1952).

defendant to look beyond the initial pleading for facts giving rise to removability"); *Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 986 F.2d 48, 54 (3d Cir.1993) ("[T]he relevant test is not what the defendants purportedly knew, but what [the document] said."). As a result, defendants were only required to remove the action within thirty days of "receiv[ing]" the order "indicating the post commencement satisfaction of federal jurisdictional requirements ... by reason of the dismissal of [the] nondiverse part[ies]." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68–69, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996); *see also Stack v. Strang*, 191 F.2d 106, 108 (2d Cir.1951) (holding that the applicable filing period commenced at the time defendant "received a copy of the order" from which he could ascertain removability). Because defendants filed their notice of removal on January 27, 2003, less than thirty days after they received the December Order on December 30, 2002, the filing was timely.[16]

Nasso acknowledges that Section 1312(a) of the New York Business Corporation Law bars foreign corporations that conduct unauthorized business in New York from maintaining actions in this state.[17] He does not dispute that Films has conducted business in New York without authority. Rather, he argues that "outright dismissal" of its claims is "unwarranted where the opportunity exists for authority to be obtained *pendente lite*" and seeks the "reinstate[ment]" of Films. (Pl.'s Mem. at 18.)

■ A corporation with no authority to conduct business in New York may obtain such authority after it has already commenced an action and thereby become qualified to maintain that action. *See Jaisan, Inc. v. Sullivan*, 178 F.R.D. 412, 414 (S.D.N.Y.1998) ("[I]f the plaintiff corpora-

---

16. Indeed, defendants properly "waited until the case was ripe for removal, *i.e.*, until [Films and the LLC were] dismissed as [plaintiffs]." *Id.* at 75, 117 S.Ct. 467; 14B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 3723, at 585 (3d ed. 1998) ("A party whose presence in the action would destroy diversity must be dropped formally as a matter of record to permit removal to federal court."). Had defendants removed the case before Films and the LLC were dismissed, the removal may have been incurably invalid. *See Vasura v. Acands*, 84 F.Supp.2d 531, 538 (S.D.N.Y.2000) ("It is not relevant in determining the propriety of removal—which is measured as of the date of removal—that diversity was later created by dismissal of the non-diverse defendant."); *Wamp v. Chattanooga Hous. Auth.*, 384 F.Supp. 251, 253 (E.D.Tenn.1974) ("[D]evelopments in the lawsuit ... subsequent to removal can not serve to confer federal court jurisdiction if none in fact existed as of the time of removal."), *aff'd on other grounds*, 527 F.2d 595 (6th Cir.1975). *But see Caterpillar*, 519 U.S. at 73, 117 S.Ct. 467 (noting that the district court's lack of jurisdiction at the time of removal "remain[s]

in the [u]nerasable history of the case" but held that remand was not required where final judgment had already been entered); 14B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3723, at 588 ("The somewhat more contentious and as yet undefined doctrine has emerged that even though removal may have been improper due to a lack of diversity of citizenship at the time of removal, if the defect subsequently is cured before it is noticed, the federal court has subject matter jurisdiction to enter judgment.").

17. Section 1312(a) of the New York Business Corporation Law provides in pertinent part that "[a] foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state." The statute applies both to state courts and to federal courts whose jurisdiction is grounded in diversity of citizenship. *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949); *Virgilio Flores, S.A. v. Jerome Radelman, Inc.*, 567 F.Supp. 577, 579 (E.D.N.Y.1982).

tion is in breach of the statute when it begins an action but complies while the action is pending, the action is validated *ab initio* and may proceed unhindered"); *Manhattan Fuel Co., Inc. v. New England Petroleum Corp.*, 422 F.Supp. 797, 801 (S.D.N.Y.1976) ("[A] corporation ... can, after commencing an action, obtain authority and thereafter maintain the lawsuit."); *Beer v. F.W. Myers & Co., Inc.*, 159 A.D.2d 943, 552 N.Y.S.2d 796, 796 (4th Dep't 1990) ("[C]ompliance [with Section 3212] after commencement of an action is permissible"); *Hot Roll Mfg. Co. v. Cerrone Equip. Co.*, 38 A.D.2d 339, 329 N.Y.S.2d 466 (3 Dep't 1972) ("[A] corporation, after commencing an action, could obtain authority and, thereafter, maintain a lawsuit."). As a result, some New York courts have conditioned dismissal upon the continued failure of the foreign corporation to comply with Section 1312. *See United Arab Shipping Co. (S.A.G.) v. Al–Hashim*, 176 A.D.2d 569, 574 N.Y.S.2d 743, 743 (1st Dep't 1991) (affirming a conditional order of dismissal); *Tri–Terminal Corp. v. CITC Industries, Inc.*, 78 A.D.2d 609, 432 N.Y.S.2d 184, 185 (1st Dep't 1980) ("The more appropriate remedy was not outright dismissal of the complaint, but a conditional dismissal or a stay affording plaintiff an opportunity to cure this non-jurisdictional defect, i.e., to obtain the requisite authority."). Other courts, however, have dismissed claims outright for failure to comply with this statute. *See, e.g., Scaffold–Russ Dilworth, Ltd. v. Shared Mgmt. Group, Ltd.*, 256 A.D.2d 1087, 682 N.Y.S.2d 765, 765 (4th Dep't 1998); *Pergament Home Centers, Inc. v. Net Realty Holding Trust*, 171 A.D.2d 736, 567 N.Y.S.2d 292, 293 (2d Dep't 1991); *Conklin Limestone Co. v. Linden*, 22 A.D.2d 63, 253 N.Y.S.2d 578, 580 (3d Dep't 1964).

Particularly because Films took no steps to comply with Section 1312 before its claims were dismissed, dismissal was not unwarranted. Nasso alleges, however, that Films has since submitted an application to conduct business in this state. Accordingly, I deny the motion to remand without prejudice to its renewal upon the granting of the application and the filing of a properly noticed motion for joinder.[18]

### Review of State Court Denial of Dismissal Motion

Nasso concedes that, upon removal, a federal court may dissolve or modify any order entered by the state court. *See* 28 U.S.C. § 1450 ("Whenever any action is removed from a State court to a district court of the United States ... all injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."); *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda County*, 415 U.S. 423, 437, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974) ("Section 1450 ... recogniz[es] the district court's authority to dissolve or modify injunctions, orders, and all other proceedings had in state court prior to removal."); *Quinn v. Aetna Life & Casualty Co.*, 482 F.Supp. 22, 27 (E.D.N.Y.1979) ("This Court is therefore free to reexamine the decision of the state court denying defendant's motion to dismiss."), *aff'd*, 616 F.2d 38 (2d Cir.1980); Wright & Kane, Federal Practice & Procedure: Federal Practice Deskbook § 42 (2002) ("The orders of the state court are not conclusive, but they are binding until set aside."). He argues, however, that the Supreme Court's decision to deny defendants' dismissal motion is not

---

**18.** *See, e.g., Dixie Dinettes, Inc. v. Schaller's Furniture, Inc.*, 71 Misc.2d 102, 335 N.Y.S.2d 632, 637 (1972) (noting that the dismissal of a claim for failure to comply with Section 3212 was granted "without prejudice" to its "renew[al]").

appropriate for review because (1) the Rooker–Feldman doctrine [19] and 28 U.S.C. § 1738 preclude such review, (2) state procedural rules prohibit the reconsideration of an order that has already been reconsidered, (3) this Court's review of the September Order would preempt the appellate division's adjudication of defendants' appeal of that order, (4) a state court's decision as to matters of state law is final, (5) reconsideration would encourage forum shopping, (6) reconsideration would undermine the efficiency that the Federal Rules of Civil Procedure are designed to achieve, and (7) at least one claim would survive even if defendants were to prevail on their dismissal motion.

■■■ None of these arguments has merit. Upon removal, the orders entered by the state court are treated as though they had been entered by the federal court. *See, e.g., In re Diet Drugs*, 282 F.3d 220, 231–32 (3d Cir.2002) ("After removal, interlocutory orders of the state court are transformed into orders of the court to which the case is removed."); *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1316 (5th Cir.1992) ("A prior state court order in essence is federalized when the action is removed to federal court."); *Preaseau v. Prudential Ins. Co. of America*, 591 F.2d 74, 79 (9th Cir.1979) ("[T]he federal court ... treats everything that occurred in the state court as if it had taken place in federal court.")

(internal quotation marks omitted); *Tehan v. Disability Mgmt. Servs.*, 111 F.Supp.2d 542, 547 (D.N.J.2000) ("[T]he orders or judgments entered by the state court prior to removal should be treated as orders or judgments entered by the district court."). Because the "Rooker–Feldman doctrine does not work to defeat a district court's authority over the management of its own case," even where the exercise of such management "has the secondary effect of voiding a state court determination," the doctrine does not preclude this Court from reviewing orders that were entered prior to removal. *In re Diet Drugs*, 282 F.3d at 241–42. In any event, the doctrine does not apply to any review that is authorized by Congress. *See Kropelnicki v. Siegel*, 290 F.3d 118, 128 (2d Cir.2002). Because Section 1450 authorizes this Court to reconsider the September Order, the Rooker–Feldman doctrine does not preclude such reconsideration. [20]

■■ Nasso's reliance on state procedural rules as a basis for refusing to review the September Order is misplaced because federal procedural rules govern an action after removal. *See, e.g., Granny Goose Foods, Inc.*, 415 U.S. at 437, 94 S.Ct. 1113 ("[O]nce a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal."); *Resolution Trust Corp.*, 958 F.2d at 1316 ("Fed-

---

**19.** First announced in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and later affirmed in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the Rooker–Feldman doctrine "holds that, among federal courts, only the Supreme Court has subject matter jurisdiction to review state court judgments." *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 185 (2d Cir. 1999).

**20.** Nasso also presents no authority for his argument that reconsideration of an order entered by the state court would deny it the "full faith and credit" required by 28 U.S.C. § 1738. In reviewing the interlocutory orders of state courts, however, federal courts give those orders the same substantive effect that they would have enjoyed had the action not been removed. The federal court "takes the case up where the State court left it off." *Granny Goose Foods, Inc.*, 415 U.S. at 436, 94 S.Ct. 1113 (internal quotation marks omitted).

eral procedure governs the enforcement of a prior state court order in a case removed to federal court."); *Preaseau*, 591 F.2d at 79 ("[T]he federal rules apply after removal.") (internal quotation marks omitted). Even if Nasso is correct that New York's procedural rules prohibit the filing of multiple motions for reconsideration, it is the lack of any such prohibition in the federal procedural rules that matters here. *See, e.g., In re Ambassador Park Hotel, Ltd.*, 61 B.R. 792, 797–798 (N.D.Tex.1986) (holding that a motion for reconsideration "was not ineffective because it was the second such motion").

■ Because removal divested the state court of jurisdiction to conduct further proceedings, this Court's reconsideration of an order entered by the supreme court would not preempt the appellate division's lawful adjudication of defendants' appeal from that order. *See* 28 U.S.C. § 1446(d) ("[T]he State court shall proceed no further unless and until the case is remanded."); *Tarbell v. Jacobs*, 856 F.Supp. 101, 104 (N.D.N.Y.1994) ("[O]nce the removal procedures are completed by the filing of the Notice of Removal in the state court, 'state jurisdiction ends and any further action in the state court is void.'") (quoting *Barrett v. Southern Ry.*, 68 F.R.D. 413, 419 (D.S.C.1975)). While Nasso is correct that review of a state court's order is more

appropriate where that order concerns issues of federal law, *see, e.g., Quinn*, 482 F.Supp. at 27, review of a state court order is not inappropriate simply because it involves questions of state law, *see, e.g., Hill v. United States Fidelity & Guaranty Co.*, 428 F.2d 112, 114–15 (5th Cir.1970) ("A final decision of a state trial court is not binding on the federal courts as a final expression of the state law."), *cert. den.*, 400 U.S. 1008, 91 S.Ct. 564, 27 L.Ed.2d 621 (1971).[21] While the fact that the defendants may choose to remove an action to another forum with different procedural rules may create an opportunity for forum shopping, the Supreme Court has long held that federal procedural rules govern even where state substantive law applies. *See generally Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Thus, the principles of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny do not prohibit review of the state court's order. *See, e.g., Hill*, 428 F.2d at 114–15 (rejecting an argument about "what the federal court is *Erie*-bound to do, what as a matter of policy it should do, . . . and the evils of forum shopping").

■ While review of prior orders may slow the progress of an action, the Federal

---

21. Nasso cites three cases from the nineteenth century in support of his argument that a federal court may not review prior determinations that rest on state law. None of these cases stands for this proposition, however. Rather, they stand for the uncontested principle that a federal court picks up where the state court left off. *See Duncan v. Gegan*, 101 U.S. 810, 812, 11 Otto 810, 25 L.Ed. 875 (1879) ("The [District] Court . . . takes the case up where the State court left it off."); *Allmark v. Platte S.S. Co.*, 76 F. 615, 615 (C.C.E.D.N.Y.1896) ("This court takes the cause in the condition in which it was left by the state court."); *Milligan v. Lalance & Grosjean Mfg. Co.*, 17 F. 465, 466 (S.D.N.Y.1883)

("When a case is removed here from a state court, all prior orders stand as adjudications in the cause. . . . [N]o further hearings can be had on such matters *except as the ordinary practice of this court may warrant.*") (emphasis added). In *Allmark*, the court denied a second dismissal motion not because the initial motion concerned matters of state law, but because the defendant had failed to seek leave as it was required to do. *Allmark*, 76 F. at 615. The *Milligan* court noted that an order could be reconsidered where such reconsideration lay within the "ordinary practice" of the federal courts. *Milligan*, 17 F. at 466.

Rules of Civil Procedure are aimed at securing determinations that are "just" as well as "speedy and inexpensive." Fed. R.Civ.P. 1. If reconsideration of orders is inconsistent with the fundamental objectives of the Federal Rules, reconsideration is inappropriate. It is clear that the failure of any dismissal motion to dispose of the entire action does not render it inappropriate to reconsider the motion.

■ Defendants allege that the Supreme Court committed clear error in determining that it had personal jurisdiction over them [22] and that it decided their motion to dismiss for failure to state a cause of action using a standard that differs from that which applies to motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[23] Faced with arguments such as these, federal courts have consistently undertaken to review orders entered prior to removal in order to consider these arguments. *See, e.g., Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (noting that, while a court "has the power to revisit prior decisions of its own or of a coordinate court in any circumstance," it should be reluctant to do so unless, for example, "the initial decision was clearly erroneous and would work a manifest injustice") (citations and quotation marks omitted); *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528 (9th Cir.2000) ("[T]he District Court did not abuse its discretion in reaching the merits of the summary judgment motion" where "the California and federal summary judgment standards are different.");

*FDIC v. Bay St. Dev. Corp.,* 32 F.3d 636, 639 (1st Cir.1994) ("A state court summary judgment order may be modified or vacated following removal of the action ... upon a determination that it does not comport with Fed.R.Civ.P. 56.") (internal citations omitted); *Myers v. Moore Engineering, Inc.,* 42 F.3d 452, 454 (8th Cir.1994) (rejecting as "frivolous" an argument "that the district court erred in refusing to follow the state trial court's earlier denial of summary judgment"); *Resolution Trust Corp. v. Northpark Joint Venture,* 958 F.2d 1313, 1316 (5th Cir.1992) ("[T]he federal court must ensure that the [state court] order is consistent with the requirements of Rule 56(c) of the Federal Rules of Civil Procedure.... If the federal court declines to reconsider the state court summary judgment, then the federal court certifies that the order is indeed consistent with Rule 56(c)."), *cert. den.,* 506 U.S. 1048, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993); *Federal Deposit Ins. Corp. v. Sugarman,* Civ. No. 87–472–FR, 1987 U.S. Dist. LEXIS 14013, at *3 (D.Or. Oct. 6, 1987) (holding that it had "full authority to reconsider" a motion to dismiss denied by the state court). Accordingly, I will reconsider the merits of defendants' motions.

### Lack of Personal Jurisdiction

■ Defendants move to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. In order to defeat such a motion, a plaintiff must make "a *prima facie* showing of jurisdiction" by present-

---

**22.** They point out that the supreme court failed to make the necessary determinations as to whether each of the claims arises out of the acts upon which personal jurisdiction is based.

**23.** The supreme court determined whether Nasso "ha[d] a cause of action, not whether he ... stated one," and relied on affidavits submitted by the plaintiff. In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a federal court determines whether the plaintiff has stated a claim, not whether he or she has one, and generally limits its inquiry to the allegations set forth in the complaint.

ing either in pleadings or affidavits "legally sufficient allegations of jurisdiction." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir.2001). "[A]ll allegations are construed in the light most favorable to the plaintiff[,] and doubts are resolved in the plaintiff's favor." *Id.* "Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits." *Cut-Co Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986). Under New York law, a plaintiff must demonstrate that the court has general jurisdiction over the defendant, N.Y. C.P.L.R. § 301, or specific jurisdiction over the defendant with respect to each claim, N.Y. C.P.L.R. § 302. "If the exercise of jurisdiction is appropriate under [either] statute, the court must decide whether such exercise comports with the requisites of due process." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997).

 Section 301 codifies the common law principle that a non-domiciliary is deemed to be "present" in the state if the non-domiciliary is "doing business" in the state when the action is commenced.[24] *Hinsch v. Outrigger Hotels Hawaii*, 153 F.Supp.2d 209, 212 (E.D.N.Y.2001); *Bryant v. Finnish Nat'l Airline*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439, 440 (1965); *Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d 152, 581 N.Y.S.2d 283, 286 (1st Dep't 1992). A plaintiff must allege that the defendant was engaging in business "not occasionally or casually, but with a fair measure of permanence and continuity." *Lancaster*,

581 N.Y.S.2d at 286. Nasso has failed to allege activities of this nature. He alleges that, after selling his properties in Staten Island, Seagal remained liable on a mortgage secured by the properties, held shares in Productions,[25] negotiated a film contract in New York, attended meetings in New York to secure funding for his films, maintained a website from which New York residents purchased various products, and possessed a New York gun permit. These allegations are insufficient to establish presence under Section 301. *See, e.g., Donahue v. Far E. Air Transp. Corp.*, 652 F.2d 1032, 1039 (D.C.Cir.1981) (deeming a series of loans from New York banks insufficient under Section 301); *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 725–33 (S.D.N.Y.2001) (holding that defendants were not doing business in New York even though one or more of them was the sole shareholder of a New York corporation, made an average of four to five business trips to New York each year, viewed auditions in New York, and entered into thirty-three different business transactions to procure supplies in New York); *Fosen v. United Techs. Corp.*, 484 F.Supp. 490, 500 (S.D.N.Y.1980) (holding that a non-domiciliary's negotiations to borrow money from New York banks, even when combined with other contacts, were insufficient to support the assertion of jurisdiction under Section 301); *Lamar v. Amer. Basketball Ass'n*, 468 F.Supp. 1198, 1203 (S.D.N.Y.1979) (holding that a defendant's status as controlling shareholder of

---

**24.** The statute states that "[a] court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore." It is unclear whether an individual may be deemed "present" for the purposes by virtue of his or her business activities. *See Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 732

n. 8 (S.D.N.Y.2001); *Twine v. Levy*, 746 F.Supp. 1202, 1204 (E.D.N.Y.1990). Because I conclude that Nasso has failed to allege sufficient business activity on the part of Seagal, I do not reach this issue.

**25.** Nasso does not allege that Productions served as the agent or alter ego of Seagal.

a corporation was insufficient absent allegations that the corporation was operating as the defendant's agent or alter ego); *Keane v. Kamin,* 94 N.Y.2d 263, 701 N.Y.S.2d 698, 723 N.E.2d 553 (1999) (holding that possession of New York driver's license was insufficient); *Cardone v. Jiminy Peak Inc.,* 245 A.D.2d 1002, 667 N.Y.S.2d 82, 83 (3d Dep't 1997) (deeming insufficient the sale of lift ticket coupons in New York ski shops, the listing of defendant's telephone number in a New York telephone directory, advertisements on New York radio stations, on television stations, on billboards, and in print media, the mailing of promotional literature to certain groups and individuals in New York, and attendance at promotional events). Nasso presents no authority to the contrary. Because Nasso alleges no additional activity on the part of Steamroller, his allegations as to Steamroller are similarly insufficient.

Section 302(a) provides in pertinent part:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state . . . ; or

3. commits a tortious act without the state causing injury to person or property within the state, . . . if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

The court must determine the issue of personal jurisdiction separately for each claim asserted in the complaint. *See Cosmetech Intern., LLC v. Der Kwei Enterprise & Co.,* 943 F.Supp. 311, 317 (S.D.N.Y.1996); *Interface Biomedical Labs. Corp. v. Axiom Med., Inc.,* 600 F.Supp. 731, 734 (E.D.N.Y.1985).

■ In the amended complaint, Nasso alleges that Seagal agreed to star in "Blood on the Moon," "Genghis Khan," "Smash and Grab," and "Prince of Central Park" and that many of the events described in the complaint took place in New York. In an affidavit, he specifically alleges that Seagal agreed to star in three of these films at his residence in Staten Island. Nasso also alleges that Productions, acting with Seagal's knowledge and consent, prepared and finalized in New York a production contract for the fourth film stating that Seagal will appear in the film.[26] He

---

**26.** Defendants point out that New York courts have been reluctant to base assertions of personal jurisdiction on business transactions performed by the plaintiff on the defendant's behalf. *See Haar v. Armendoris Corp.,* 31 N.Y.2d 1040, 342 N.Y.S.2d 70, 294 N.E.2d 855 (1973); *see also Chaldon Assocs., LLC v. Daedalus Capital, LLC,* No. 01 Civ.2015, 2001 WL 1160580, at *1 (S.D.N.Y. Oct. 15, 2001). Courts, however, have asserted jurisdiction based on such transactions where, among

other things, the plaintiff is a New York domiciliary and the defendant engaged in some other purposeful activity related to the transaction. *See, e.g., Abelman, Frayne & Rezac v. Scientia Corp.,* No. 84 Civ. 834, 1984 WL 620, at *2 (S.D.N.Y. July 19, 1984) (distinguishing the *Haar* line of cases on these grounds). In any event, as explained below, the acts that defendants took in furtherance of the agreement of star in "Prince of Central Park" con-

further alleges that Seagal took subsequent steps in New York in furtherance of all four contracts—namely, hiring two different producers for "Blood on the Moon," agreeing on behalf of Steamroller to provide his services in "Smash and Grab," and negotiating distribution agreements for all four films. All of these activities constitute transactions of business for the purposes of Section 302(a)(1). *See Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, 75 (1965) (holding that "the statutory test may be satisfied" by "a single transaction in New York" and that the transaction may consist of "purposeful acts performed by the appellant in this State in relation to the contract" other than consummation even if those acts are taken "preliminary or subsequent to . . . execution"); *Taibleson v. Nat'l Ctr. For Continuing Educ.*, 190 Misc.2d 796, 740 N.Y.S.2d 772 (2002) ("CPLR 202 is a 'single act statute' and one transaction is sufficient to support transaction.").

These transactions support the exercise of jurisdiction over defendants [27] with respect to all of those claims with which they bear a "substantial relationship." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 43 (1988).[28] They bear a substantial relationship with all of the claims for breach of contract other than the one involving a loan agreement because they represent the formation or advancement of the relevant contracts. Similarly, they bear the requisite relationship to the claims for breach of fiduciary duty because Seagal's agreements to star in the films and the steps he took in furtherance of those agreements gave rise to his fiduciary duty to carry out the agreements. *See, e.g., Lebel v. Tello*, 272 A.D.2d 103, 707 N.Y.S.2d 426, 427 (1st Dep't 2000) ("Although [Section 302(a)(1)] is typically invoked in cases involving contractual liability, it also has application in tort actions."). Finally, they bear a substantial relationship to Nasso's claims for unjust enrichment because Nasso alleges that he provided his services in connection with the four films "[i]n furtherance of Seagal's promise to appear in [them]." (Am.Compl.¶ 41.)

Nasso states in his brief that he made the loan to Seagal in New York. Neither Nasso's pleadings nor his affidavits, however, contains this allegation. Still, even where the loan itself is not made in New York, "[t]he act of borrowing money from a New York-based entity can, when considered in combination with other contacts, give rise to jurisdiction under CPLR § 302(a)(1)." *Sun Forest Corp. v. Shvili*, 152 F.Supp.2d 367, 387 (S.D.N.Y. 2001). Nasso argues that the fact that both he and Seagal resided in New York at the time, when coupled with Seagal's other

stitute an adequate basis for the assertion of personal jurisdiction.

27. Because Nasso alleges that Seagal always acted both on his own behalf and as Steamroller's agent, the allegations as to Seagal's transactions of business apply to Steamroller as well.

28. Defendants argue that the amended complaint only discusses a "package deal" and says nothing about separate agreements. The amended complaint, however, makes separate allegations as to Seagal's agreement to star in each film. Therefore, it can be read—and, after drawing all inferences in Nasso's favor, must be read—to allege separate agreements. They also argue that the allegations contained in Nasso's affidavit are insufficient because they fail to specify the representative of Productions to whom Seagal made his promises, the precise date on which these promises were made, the other terms of the agreements, and whether the agreements were made orally or in writing. They present no authority, however, for the proposition that any of these details are necessary to make a *prima facie* showing of jurisdiction.

contacts, is sufficient to support the exercise of jurisdiction over defendants with respect to his claim for breach of the loan contract. Defendants do not argue otherwise.

■ Defendants contend that the principles of due process preclude this Court from asserting jurisdiction over any of these claims. Because Seagal's contacts with New York at the time of these events were not "random or unintentional actions," basing personal jurisdiction on them would not offend "traditional notions of fair play and substantial justice" under *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997). Indeed, in residing in New York and in "purposefully direct[ing]" his business activities at other New York residents, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), Seagal "availed himself of the privileges of conducting business [there] so as to reasonably expect to be subject to suit here." *PDK Labs, Inc.*, 103 F.3d at 1111. Accordingly, I deny defendants' motion to dismiss for lack of personal jurisdiction the claims for breach of contract, breach of fiduciary duty, and unjust enrichment.

■ Nasso does not contend that defendants' seizures of Productions' corporate opportunities arise out of meetings that took place in New York. Rather, he contends that the torts themselves were committed in New York because "Ticker" and "Exit Wounds" were filmed and negotiated while Seagal resided in New York, worked under the auspices of Productions, and benefitted from Nasso's help. The fact that Seagal, Productions, and Nasso were domiciliaries of New York, however, does not establish that the tort itself was committed there. Nasso does not even allege that the remaining torts—the conversions and the misrepresentation—took place in New York. Accordingly, Section 302(a)(2) does not provide a basis for the exercise of personal jurisdiction with respect to these claims.

■ Nasso argues that this Court can exercise jurisdiction pursuant to Section 302(a)(3).[29] Specifically, he argues in his brief that the financial losses that resulted from these torts took place in New York "not only because the plaintiff resided here but also because the torts involved a New York corporation and are related to the engagement of both plaintiffs and defendants in business transacted in New York." (Pl.'s Mem. at 48.) Nasso does not elaborate on, or offer any evidentiary support for, his statement that these torts relate to business transactions conducted in New York. Under settled law, the fact that Nasso and Productions are New York domiciliaries is insufficient, without more, to demonstrate that an injury took place there. *See, e.g., Fantis Foods, Inc. v. Standard Importing Co., Inc.*, 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122, 126 (1980) ("It has ... long been held that the residence or domicile of the injured party within a State is not a sufficient predicate for jurisdiction, which must be based upon a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there."); *Andrew Greenberg, Inc. v. Sir–Tech Software, Inc.*, 297 A.D.2d 834, 746 N.Y.S.2d 736, 739 (3d Dep't 2002) ("[I]t is apparent

**29.** Section 302(a)(4) does not apply because these alleged torts do not arise out of Seagal's ownership of real property in New York.

that plaintiff is unable to establish the kind of direct injury within New York that the statute requires, for any injury sustained by plaintiff is sustained in this State solely because plaintiff has its corporate presence here."); *Cooperstein v. Pan–Oceanic Marine, Inc.*, 124 A.D.2d 632, 507 N.Y.S.2d 893, 895 (2d Dep't 1986).[30] Accordingly, I dismiss for lack of personal jurisdiction the claims of seizure of a corporate opportunity, conversion, and misrepresentation.[31]

### Failure to State a Claim

Defendants also move to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[32] In considering a motion to dismiss under Rule 12(b)(6), a "court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2001). A court will not dismiss a claim under Rule 12(b)(6) "unless it is satisfied that the complaint cannot state any set of facts that would entitle [plaintiff] to relief." *Id.*

In order to state a claim for breach of contract under New York law, a plaintiff must allege (1) the existence of a contract, (2) performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages. *See*

---

**30.** Even if Nasso could demonstrate that "Ticker" and "Exit Wounds" generated income inside the state, this showing of lost profits within New York would be insufficient to establish that an injury took place there. *See Andrew Greenberg, Inc.*, 746 N.Y.S.2d at 739 ("In this case, the injury sustained by virtue of New York sales of defendants' software products is [immaterial because it is] no different than that sustained by reason of sales in any other state or nation.").

**31.** Nasso requests that he be afforded an opportunity to conduct discovery on the issue of personal jurisdiction. Because he has not made a *prima facie* showing of jurisdiction and has not identified the factual issues on which he seeks discovery, however, discovery is unwarranted. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir.1998) ("[S]ince [the plaintiffs] did not establish a prima facie case that the district court had jurisdiction over [the defendant], the district court did not err in denying discovery on that issue."); *Norvel Ltd. v. Ulstein Propeller AS*, 161 F.Supp.2d 190, 208 (S.D.N.Y.2001) ("In the absence of any prima facie showing of personal jurisdiction, I find that it would be inappropriate to subject defendants to the burden and expense of discovery."); *Socialist Workers Party v. Attorney General*, 375 F.Supp. 318, 325 (S.D.N.Y.1974) ("Surely a plaintiff must make some specific factual showing in order" to "compel a defendant to remain in an action during discovery.").

**32.** Nasso seeks to convert the motion to dismiss into a motion for summary judgment. Because this action is still in the pleading stage and discovery has not been completed, I decline to convert the motion. *See, e.g., Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower*, No. 01 Civ. 5518, 2003 WL 1751785, at 14 (S.D.N.Y. Apr. 2, 2003) ("Plaintiffs have not obtained discovery from defendant related to their claims and thus their claims are not ripe for summary adjudication."). Nasso contends that defendants opened the door to conversion by submitting a copy of an indictment filed against Nasso and a letter from the prosecutor to the judge in that case. Because these documents are matters of public record, consideration of these documents would not transform the present motion into a summary judgment motion. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (holding that, where a district court may take judicial notice of public records and the defendant's proffer of them puts the plaintiff on notice that the district court might consider them, "the district court did not err by referring to the[m] ... in considering the motion to dismiss"); *John Gil Constr., Inc. v. Riverso*, 99 F.Supp.2d 345, 350 n. 7 (S.D.N.Y.2000) ("The indictment is a matter of public record and thus, to the extent it is relevant, it may be considered on defendants' motion to dismiss."). In all events, I will not consider these or any other documents apart from the pleadings.

*Rexnord Holdings v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994); *WorldCom, Inc. v. Sandoval,* 182 Misc.2d 1021, 701 N.Y.S.2d 834, 836 (1999). Nasso alleges that defendants breached contracts in which Seagal promised to star in the four films. Defendants do not dispute that Nasso has satisfied the last three elements with respect to these claims. Rather, they argue that he has failed to allege the existence of a contract concerning the four films because the complaint does not state (1) that a plaintiff was a party to the contract or the name of the corporate representative with whom Seagal formed the contract, (2) that Productions' directors or shareholders established the fairness of the transaction, (3) the material terms of the contract, or (4) that the contract was made in writing.

Paragraph 87, 89, 91, and 93 of the amended complaint state that Seagal owed "his contractual obligations [to star in the four films] to Plaintiffs." Defendants present no authority for the proposition that a plaintiff who alleges that a corporation formed a contract must identify the representative who acted on the corporation's behalf and state that the directors or shareholders approved any transaction with a controlling shareholder. The complaint alleges that Nasso agreed to develop, produce, and distribute the films in exchange for a $250,000 production fee, that Seagal agreed to star in them in exchange for the market value of his services, and that Productions would own them. Because it specifies the services to be performed and the consideration to be paid, the complaint adequately states the material terms of the contract. *Cf. Tower Int'l v. Caledonian Airways,* No. CV–93–1122, 1996 U.S. Dist. LEXIS 20311, at *20 (E.D.N.Y. Feb. 7, 1994) ("Consideration is a required material term for a valid services contract in New York."); *Cooper Square Realty, Inc. v. A.R.S. Management Ltd.,* 181 A.D.2d 551, 581 N.Y.S.2d 50, 51 (1st Dep't 1992) ("As price is an essential ingredient of every contract for the rendering of services, an agreement must be definite as to compensation"). A contract that "by its terms is not to be performed within one year from the making thereof" is void unless made in writing. N.Y. Gen. Oblig. Law § 5–701(a)(1). This provision applies "to those contracts only which by their very terms have absolutely no possibility in fact and law of full performance within one year." *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992, 993 (1984); *see also Kestenbaum v. Suroff,* 268 A.D.2d 560, 704 N.Y.S.2d 260, 261 (1999). While defendants may be correct that "it would defy common sense to contend that four feature films would be produced and released within one year," (Defs.' Mem. in Supp. at 40), the fact that the contract is "susceptible of fulfillment within that time, in whatever manner and however impractical," is sufficient to shield the contract from this provision of the Statute of Frauds. *D & N Boening, Inc.,* 483 N.Y.S.2d 164, 472 N.E.2d at 993. Accordingly, I deny defendants' motion to dismiss these claims for breach of contract for failure to state a claim.[33]

Nasso asserts claims in *quantum meruit* because he rendered services with the expectation of compensation and defendants accepted those services without paying the reasonable value of those services. "In order to make out a claim in *quantum meruit,* a claimant must establish (1) the performance of the services in good faith, (2) the acceptance of the ser-

---

**33.** Defendants do not even address Nasso's claim for breach of a loan contract. Because the complaint alleges that Nasso personally loaned Seagal a sum of money that was payable on demand, Nasso has stated a claim upon which relief can be granted.

vices by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Geraldi v. Melamid,* 212 A.D.2d 575, 622 N.Y.S.2d 742, 743 (2d Dep't 1995). Defendants argue that Nasso has failed to state a claim because he does not allege that they derived any benefit or enrichment from Nasso's activities. *See, e.g., Landcom, Inc. v. Galen–Lyons Joint Landfill Comm'n,* 259 A.D.2d 967, 687 N.Y.S.2d 841, 843 (4th Dep't 1999). Because Nasso and Seagal agreed that Nasso would receive a producer's fee for his contribution to the joint venture, however, Nasso may prove that Seagal was enriched by his failure to provide that fee. Accordingly, I deny defendants' motion to dismiss the claims in *quantum meruit* for failure to state a claim.

■ Nasso alleges that defendants breached their fiduciary duties to act in good faith and deal fairly with him and with Productions when Seagal failed to star in the four films. "Under New York law, the elements of a claim for breach of fiduciary duty are (1) existence of fiduciary relationship and (2) breach of a fiduciary duty." *Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 277 B.R. 20, 37 (S.D.N.Y.2002).

■ Nasso has satisfied the first element. Defendants do not dispute that they had a fiduciary relationship with Productions.[34] They contend, however, that they had no such relationship with Nasso because Nasso had not placed his trust and confidence in Seagal and had not "reasonably relie[d] on the [Seagal's] superior expertise or knowledge." *WIT Holding*

*Corp. v. Klein,* 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (2d Dep't 2001). Because Nasso and Seagal had worked together closely for over a decade, Nasso may be able to prove he reasonably relied on Seagal's superior expertise or knowledge.

Nasso has also fulfilled the second requirement. Defendants argue that Seagal breached no fiduciary duty to Productions because Seagal was not "undertaking [a] corporate action" when he failed to appear in the films. *Alpert v. 28 Williams St. Corp.,* 63 N.Y.2d 557, 483 N.Y.S.2d 667, 473 N.E.2d 19, 25 (1984). Because Productions was organized for the purpose of developing and producing films, Nasso may prove that Seagal failed to act in good faith and to deal fairly in its relations with the corporation when he refused to star in the films. They also argue that Nasso does not allege direct injuries that are independent of any harm to Productions. Nasso, however, alleges injury to his reputation in the film industry as a direct result of the breach. *Cf. Hoheb v. Pathology Assocs. of Albany, P.C.,* 146 A.D.2d 919, 536 N.Y.S.2d 894, 897 (1989) ("[P]laintiff has failed to demonstrate the breach of any duty independent of the contract and flowing directly to him, rather than the corporation.").

Accordingly, I deny defendants' motion to dismiss the claims for breach of fiduciary duty for failure to state a claim.

■ Nasso also alleges that defendants breached his partnership agreement with Seagal. Defendants contend that Nasso has failed to state a claim for breach because he alleges in paragraph 131 that he and Seagal agreed "to develop, produce,

---

34. "[I]n some cases stockholders who dominate and control a corporation[ ] occupy a position of partial trust." *Equity Corp. v. Groves,* 294 N.Y. 8, 60 N.E.2d 19, 21 (1945). As a result, "[t]heir relation to the corporation is fiduciary in character[,] and they may be held accountable in equity for detriment to the corporation caused by their breach of the fiduciary obligation arising from that relationship and for profits resulting to them from such breach." *Id.*

market and distribute television and film projects and collect the foreign license fee advances" and alleges in paragraphs 15 and 33 that the Nasso–Seagal Entities were organized to perform the same activities. "[T]he rule is well settled" in New York "that a joint venture may not be carried on by individuals *through* a corporate form." *Weisman v. Awnair Corp. of Am.*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415, 418 (1957). Indeed, when parties form a corporation to carry out the business of the partnership, they cease to be partners. *Id.* ("When parties adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties, and obligations of stockholders. They cannot be partners *inter sese* and a corporation as to the rest of the world.") (internal quotation marks omitted); *Berke v. Hamby*, 279 A.D.2d 491, 719 N.Y.S.2d 280, 281 (2d Dep't 2001) ("[A]s a general rule, a partnership may not exist where the business is conducted in a corporate form.... Parties may not be partners between themselves while using the corporate shield to protect themselves against personal liability.") (internal citations and quotation marks omitted); *Notar–Francesco v. Furci*, 149 A.D.2d 490, 539 N.Y.S.2d 800,

801 (2d Dep't 1989) ("Once the [parties] formed a ... corporation, the partnership was no longer in existence, and the partnership agreement was a nullity.... Once they adopted the corporate form, they ceased to be partners, and had only the rights, duties and obligations of stockholders.") (internal citations omitted).

██ Nasso urges this Court to carve out from this general rule an exception for close corporations. He cites the dissenting opinion of Judge Fuld in *Kruger v. Gerth*, 16 N.Y.2d 802, 263 N.Y.S.2d 1, 210 N.E.2d 355 (N.Y.1965), which stated that "there is no inherent reason why a court of equity cannot treat the participants in a genuine close corporation, insofar as their relationship *inter sese* is concerned, as they regard themselves—as partners or joint venturers." *Id.* at 357. As Judge Fuld himself "recognize[d]," however, "this view runs counter to [the] decisions" of New York's highest court. *Id.* 357 n. 1. Years earlier, the Court of Appeals had rejected the same argument over a similar dissent. *See Weisman*, 165 N.Y.S.2d 745, 144 N.E.2d at 415–19. In light of this precedent, Nasso's argument must fail under New York law. Accordingly, I grant defendants' motion to dismiss Nasso's claim for breach of a partnership contract for failure to state a claim.[35]

---

**35.** Nasso seeks leave the replead. "When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'" *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990) (quoting 2A Moore & Lucas, Moore's Federal Practice ¶ 12.14, at 12–99 (2d ed.1989)). Defendants argue that a grant of leave to replead would be inappropriate because Nasso has had ample opportunity to plead his case correctly and because amendment would be futile. The fact that Nasso has amended his complaint once before does not preclude the granting of leave to replead. *Cf. id.* (holding that the district court erred in denying leave to replead even though the plaintiff had already amended his complaint once as a matter of course). In the

case cited by defendants, *Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir.1983), the Second Circuit held that the district court "did not abuse its discretion in refusing to give plaintiffs a fourth attempt to plead." *Id.* at 94. While the amended complaint's allegations concerning the overlap between the affairs of the corporations and those of the partnership and joint venture are fatal to Nasso's claim for breach of the partnership contract, a different set of pleadings might cure this defect and survive a motion to dismiss. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir.2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."); *Ron-*

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted with respect the claims of misrepresentation, conversion, seizure of corporate opportunities, and breach of a partnership contract and denied in all other respects. Plaintiff's motion for remand is denied without prejudice to renewal.

*zani,* 899 F.2d at 199 (holding that the plaintiff was entitled to replead where it was not clear that he "could not correct deficiencies in his complaint"). Accordingly, I grant Nasso leave to replead.